1

2

3

4

5

6

7

8

9

10           IN THE UNITED STATES DISTRICT COURT

11          FOR THE EASTERN DISTRICT OF CALIFORNIA

12   DAVID WAYNE BRISTOW,

13           Petitioner,              No. CIV S-00-2546 GEB JFM P

14      vs.

15   C. TERHUNE, Director, CDC,

16           Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

17   _____/

18           Petitioner is a state prisoner proceeding through counsel with an application for a

19   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997conviction on

20   charges of assault with intent to commit forcible oral copulation, false imprisonment by violence,

21   forcible oral copulation, rape by a foreign object, forcible rape, and attempted forcible rape.

22   Petitioner claims that his constitutional rights were violated when the trial court abused its

23   discretion by permitting the prosecution to introduce evidence of uncharged prior offenses and by

24   failing to grant petitioner a new trial due to juror misconduct.

25   /////

26   /////

1

PROCEDURAL HISTORY

On November 14, 1996, the state filed an information charging petitioner with assault with intent to commit forcible oral copulation, false imprisonment by violence, forcible oral copulation, rape by a foreign object, forcible rape, and attempted forcible rape.  Petitioner was tried in the San Joaquin County Superior Court on January 6, 1997.  (CT 75-77.)  The jury returned a guilty verdict on February 25, 1997.  (CT 189-223.)

Petitioner filed a motion for new trial in the San Joaquin County Superior Court on April 28, 1997.  (CT 378-79.)  The affidavit of Juror No. 8 was appended to that motion.  (CT 382.)  Petitioner's motion for new trial was denied on May 12, 1997.  (CT 383.)

Petitioner appealed his conviction to the Court of Appeal for the State of California, Third Appellate District, and on April 20, 2000, petitioner's conviction was affirmed. Petitioner filed a petition for review to the California Supreme Court, which was denied on June 28, 2000.

FACTS[1]

At approximately 10 p.m. on October 9, 1996, [petitioner] and his brother-in-law, Larry Bowles, solicited Rosanna Abat and her daughter, Isabelle Mendoza, for acts of prostitution for $40.  The two women schemed to take the money without performing the negotiated sex acts, an activity they referred to as "ganking."  The four of them drove over to an apartment complex on Maple Street, where the women told [petitioner] and Bowles to wait in the truck until they got a room and returned.  Abat and Mendoza hid in the laundry room, where they encountered 18-year-old Crina and her 15-month-old son.  Crina is Abat's daughter-in-law and Mendoza's sister-in-law.

[Petitioner] and Bowles eventually found the women, who pretended they were hiding from Mendoza's abusive boyfriend. [Petitioner] saw 16-year-old Lyndsay sleeping outside the laundry room.  Mendoza and Abat then left with [petitioner] and Bowles to go to another apartment.  When they arrived, the two women got into the car with Mendoza's boyfriend and drove away.

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Bristow , No. C026756, a copy of which is attached as Exhibit B to Respondent's Answer, filed February 16, 2001.

[Petitioner] and Bowles eventually met up with their wives. [Petitioner] and his wife returned to the laundry room at the Maple Street apartment complex to look for Abat and Mendoza. While his wife waited in the truck, [petitioner] confronted Crina and asked if she had seen the women. After Crina denied having seen them since they left, [petitioner] ordered her to get on her knees and orally copulate him, threatening to hurt her if she did not comply. Although Crina was afraid, she refused to perform the act. [Petitioner] asked Crina if Lyndsay engaged in prostitution, and Crina replied that she did not.

After [petitioner] left the laundry room, Crina used her eyeliner to write his license plate number on a washing machine. She then ran upstairs to a vacant apartment where Lyndsay had gone to continue sleeping. Crina awakened Lyndsay and told her that Abat and Mendoza had ganked [petitioner], that Crina had almost been raped by him, and that she wanted to leave immediately. Lyndsay declined to leave because it was cold outside and she did not want to get picked up for a curfew violation. After checking to see if the doors were locked, Lyndsay, Crina, and her baby went to sleep in the apartment.

Crina and Lyndsay were awakened when [petitioner] opened the bedroom door. They asked how he got in the apartment and what he was doing there. [Petitioner] said he had a key to the apartment and was looking for Abat and Mendoza. [Petitioner] left after the girls asked him to go.

Crina and Lyndsay were awakened later when [petitioner] opened the bedroom door holding a large kitchen knife. He threatened to hurt them and Crina's baby if they did not do what he wanted. Lyndsay and Crina began crying, but did not resist for fear [petitioner] would hurt them or the baby. [Petitioner] incapacitated Crina by putting electrical tape around her mouth, hands, and ankles.

[Petitioner] ordered Lyndsay to take off her pants and shoes, whereupon he taped her mouth and taped her wrists behind her back so tightly that it cut off her circulation. He then led Lyndsay at knife point to his truck, where he made her lie down in the front seat. During a 10-minute drive, [petitioner] stuck his finger into Lyndsay's vagina twice. Lyndsay told [petitioner] she was 15, although she was really 16.

When [petitioner] stopped the truck, he took off Lyndsay's underwear and taped her eyes. He walked her over to a different area, unzipped his pants, stated he was going to rape her, and demanded that she orally copulate him. When Lyndsay refused, [petitioner] punched her in the face. Lyndsay orally copulated [petitioner], who then raped her, but withdrew after about two minutes to shift her before he penetrated her again. [Petitioner]

lost his erection and forced Lyndsay to orally copulate him once more.  [Petitioner's] penis continually became limp and fell from Lyndsay's mouth whereupon he would curse and yell.  Each time she was able to speak, Lyndsay would ask to be taken home, but [petitioner] did not respond to her pleas.

After about an hour, [petitioner] moved Lyndsay to a different location a short distance away, tied her to a metal seat and forced her to sit there and orally copulate him for several hours. [Petitioner's] penis continually fell from Lyndsay's mouth and, when she let out a big sigh, [petitioner] struck her.  He threatened to kill her if she bit him, and to hit her every time his penis fell out. One time, [petitioner] became erect and attempted, without success, to have intercourse.

[Petitioner] left for about 15 minutes.  Upon returning, he was angered to see that Lyndsay had tried to escape.  He told her he was going to shave her vaginal area to make it easier for him to penetrate her.  When Lyndsay advised [petitioner] that the problem was not her hair but that he was not hard, he hit her again.

[Petitioner] shaved Lyndsay and made her orally copulate him again.  He refused to loosen her hands, which were swollen and hurt.  After people started arriving to work nearby, [petitioner] told Lyndsay he was going to take her out of town.  Lyndsay thought she was going to die.  [Petitioner] gagged her, pulled her T-shirt up over her head, threw her to the ground, and tied her ankles to her wrists behind her back.  He started putting objects over her, and everything got dark.

During the sexual assault on Lyndsay, Crina managed to free the tape from her feet and walk to a neighbor's apartment.  Rafael Trujillo opened his door to find Crina with several pieces of electrical tape wound all the way around her head, covering her mouth.  Her arms were tied behind her back with rope and electrical tape.  She looked frightened, desperate, nervous and on the verge of tears.  Trujillo freed her hands, and Crina removed the tape from her mouth.  Because Trujillo did not have a telephone, Crina went to a nearby market to call the police.

When the police arrived, Crina was excited and crying.  She reported what had happened and told officers that she had written [petitioner's] license plate number in the laundry room.  Officer Nies went to the laundry room, called the license number into police dispatch, and learned the truck was registered to an address on North Sacramento Street in Lodi.  Nies proceeded to that address, saw [petitioner's] truck parked there, and radioed Officer Cunningham, who was proceeding to the area.

After Officer Cunningham and other officers arrived, Cunningham observed [petitioner] heading for his truck and arrested him.  The

officers began searching the compound for Lyndsay.  Officer
Murray approached [petitioner], who was sitting in a patrol car,
and asked him where Lyndsay was.  [Petitioner] replied, "I don't
know nothing about no girl."  Officer Murray was positive that
[petitioner] never told him he had been in the back of the
compound with a hooker.

Lyndsay was discovered buried under a tent and used tires.  She
was hog-tied, gagged and blindfolded, nude from the waist down,
and had a T-shirt pulled up over her head.  She had electrical tape
and wire wrapped so tightly on her wrists, mouth and ankles, that
the officers could not use a knife to remove it for fear of cutting
her.  The tape around her throat was tight enough to restrict the
flood of blood and affect her breathing.  Lyndsay repeatedly
thanked the officers for rescuing her.

(People v. Bristow, slip op. at 2-7.)

TRIAL TESTIMONY

At trial, petitioner testified in his own defense.  The state court described

petitioner's testimony concerning what happened on October 9, 1996:

[Petitioner] and his wife had an open relationship such that she did
not object to his paying a prostitute for oral sex.  He told his wife
about what had happened earlier in the evening with Abat and
Mendoza.  She wanted [petitioner] to get the money back, so they
drove to the Maple Street apartment complex.

When [petitioner] arrived at the complex, he told Crina that he
knew she had participated in the ganking ruse and demanded that
she either give him the money back or orally copulate him.  Crina
refused to do so, but said that her friend Lyndsay would and that
she was into sadomasochistic bondage.  Crina said [petitioner]
could tie her up and she would watch Lyndsay and [petitioner]
engage in sex, but did not want to participate herself.  Crina gave
him the number of the vacant apartment at which she and Lyndsay
were staying.

[Petitioner] dropped off his wife and returned to the apartment.  He
brought rope and electrical tape, which he anticipated using for
bondage, and he brought a steak knife to cut the rope.  [Petitioner]
entered the unlocked front door of the apartment and walked into
the bedroom.  Crina gestured for [petitioner] to leave, so he did so
for a short period of time.

[Petitioner] returned to the apartment and asked Lyndsay if Crina
had told her about the arrangement regarding oral sex and bondage.
Lyndsay said she was agreeable to performing the acts and did not

/////

indicate any unwillingness.  He denied ever displaying the knife in a menacing way or threatening to hurt anyone.

[Petitioner] decided he would prefer to have sex with Lyndsay somewhere else because they were using the apartment illegally and because he felt uncomfortable with Crina's baby there.  He also had second thoughts about whether it was appropriate for Crina, who [petitioner] thought was a minor, to participate.  According to [petitioner], Crina said she was 17 years old and he thought Lyndsay was 18 years old.

Lyndsay agreed to take a ride with [petitioner].  While she was in the truck, she spread her legs without being asked.  [Petitioner] fondled her and inserted his finger in her vagina, without any objection from Lyndsay.  When they reached North Sacramento Street, where [petitioner] worked as a mechanic, he asked Lyndsay if he could blindfold her because he could not let her see how he opened the gate to his workplace.  He taped her mouth because he was "just playing" as part of the bondage.  They got into a car, where [petitioner] fondled Lyndsay and she orally copulated him.  When he got an erection, Lyndsay straddled him for intercourse.  [Petitioner] stopped as his penis started to enter her, saying that was not what he wanted.  Lyndsay, who was willing to do whatever [petitioner] wanted, said there was not enough room in the car for anything else.

[Petitioner] took Lyndsay into a tent, where he taped her hands because he thought that was part of the bondage sex she wanted.  [Petitioner] asked Lyndsay if she wanted to be struck as part of the sadomasochistic sex.  Because he thought she nodded her head, he struck her lightly with his open hand.  [Petitioner] admitted that his limp penis sometimes fell out of Lyndsay's mouth, but denied telling her he was going to hit her each time that it did.

According to petitioner, Lyndsay never asked to be taken home but instead suggested they return to the apartment to finish their sex acts.  It was her suggestion to shave her pubic hair.  After doing so, he rebound her to resume their bondage sex acts.  Lyndsay orally copulated [petitioner] from several different positions, but he was unable to get an erection.  She began cussing and said, "That's it."  [Petitioner] was frustrated and grabbed her T-shirt, pulling it up over her head.  He left her under the tent, face down, with her hands tied behind her back and the shirt above her head.  He thought she could free herself relatively easily because he had not bound her tightly.

[Petitioner] got into his truck, started the engine, and then changed his mind about leaving Lyndsay bound.  He walked back through the gate but when he heard the guard dog next door bark, he thought his truck might be rolling and ran back towards it, at which point the police took him into custody.

When Officer Murray told [petitioner] he was concerned about a missing 16-year-old girl, [petitioner] responded that he did not know anything about a 16-year-old girl, but that he had been in the back with a hooker.  [Petitioner] admitted he did not tell the police that Lyndsay agreed to participate in bondage sex.

[Petitioner] denied ever molesting Sarah or Brandy and claimed that Sarah's grandmother, who became her legal guardian in 1994, had threatened to use Sarah to get even with him.

(People v. Bristow, slip op. at 8-11.)

## ANALYSIS

### I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court

1   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

2   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

3   123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

4   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

5          The court looks to the last reasoned state court decision as the basis for the state

6   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

7   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

8   habeas court independently reviews the record to determine whether habeas corpus relief is

9   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

10  II.  Petitioner's Claims

11          A.  Uncharged Offenses Admitted as Propensity Evidence

12          Petitioner contends that the trial court abused its discretion by failing to exclude

13  the testimony of his stepdaughter, Sarah, and her friend, Brandy, concerning several incidents

14  that allegedly occurred in the summer of 1993.  Petitioner contends their testimony was of

15  limited probative value because the prior conduct was not similar to the charged offenses, and the

16  prejudice to petitioner was extreme based on the ages of the young children.  Petitioner notes the

17  uncharged offenses were offenses with children under 12; the instant offense was with a person

18  older than 12.  Petitioner also argues that the admission of this evidence was also highly

19  inflammatory given that society views child molesters as odious.

20          Respondent argues that the trial court did not infringe on petitioner's rights to due

21  process and a fair trial because the trial court carefully weighed the prejudice versus the probative

22  value of the evidence after a lengthy hearing in limine and properly admitted the evidence under

23  California Evidence Code § 352.  Respondent contends this evidence was highly probative to

24  bolster the credibility of Crina and Lyndsay, which petitioner tried to impeach by comparison to

25  Rosanna and Isabella, who were prostitutes and crack cocaine users, and to show that petitioner

26  had the propensity to commit sex crimes against female children.

The state court described the trial testimony concerning this claim as follows:

At trial, the court permitted the prosecution to introduce evidence of prior uncharged sexual offenses committed by [petitioner]. His [step]daughter, Sarah, and her friend, Brandy, testified about sexual offenses [petitioner] had committed against them about three years earlier, when Brandy was ten years old and Sarah was six or seven years old. On one occasion, while Brandy and Sarah were using a wading pool, [petitioner] entered the pool wearing his underwear, reached under Sarah's swimsuit, and touched her chest. He warned the girls that he would hurt them if they told anyone about the touching. Another time, he got in the pool with them while he was naked. On another occasion, he sat next to Brandy in the bleachers at a baseball game and put his hand down her pants, touching her vagina through her underpants. [Petitioner] took Brandy's hand and placed it on his penis. She moved to another part of the bleachers to get away from [petitioner].

At the home of Sarah's grandmother, Brandy saw [petitioner] try to force Sarah's mouth open and put his penis in it. On another occasion, Brandy was playing a game with Monopoly money and said to [petitioner], "Look, I have a $100 bill." [Petitioner] offered to show her a real $100 bill if she would take off all her clothes. One time when Brandy and Sarah were playing a Nintendo game in the bedroom, [petitioner] came in naked and asked them if they wanted to touch his penis. Brandy refused, but Sarah touched it. Brandy did not immediately tell anyone about these incidents because she was scared [petitioner] would hurt her.

Sarah testified that on two occasions [petitioner] asked Brandy if she wanted to play with or suck his penis. [Petitioner] also asked Sarah to suck his penis and, on one occasion, forced her head down on it. Another time, [petitioner] took her to the garage, laid her down on the Ping-Pong table, and started to put his penis in her mouth. On yet another occasion, [petitioner] asked Sarah to suck his penis, and he held it until he ejaculated. He also masturbated to ejaculation in the shower once with her. Sarah did not tell any adult about [petitioner's] actions because he had threatened her and she was scared of both [petitioner] and her mother.

The parties stipulated that [petitioner] was never arrested, charged or brought to court with respect to any of the alleged acts with Brandy and Sarah.

(People v. Bristow, slip op. at 7-8.) Petitioner denied that he had ever molested these children.

The state appellate court rejected this claim, stating:

Here, the principal issue was whether [petitioner's] sexual activity with the victims was consensual. The evidence of his prior conduct, although not identical to the present offenses, showed that

9

[petitioner] had forced other young females to perform nonconsensual sex acts, particularly oral copulation.  This tended to show the present offenses were not consensual.

The prior offenses were no more inflammatory than the present offenses, which involved a greater degree of brutality and assaultive behavior toward the teenagers.  This factor supports introduction of the evidence.  [Citations omitted.]  It also lessened the likelihood that the jury convicted [petitioner] merely to punish him for the prior offenses, for which he was not prosecuted.  [Citation omitted.]  Moreover, this likelihood was decreased by the jury instructions, which advised the jury they could not convict [petitioner] based merely on his prior conduct.  [Citation omitted.]

Furthermore, the prior acts were not remote, occurring only three years earlier, and the evidence came from an independent source.  Both factors favor introduction of the evidence.  Lastly, the evidence did not entail an undue consumption of time as the testimony of Brandy and Sarah comprised only 55 pages of the voluminous report's transcript.  [Petitioner] simply denied their allegations and claimed they arose from difficulties he had with Sarah's grandmother.

Accordingly, even though the prior sex offenses were not identical to the present offenses and [petitioner] was not convicted of committing them, the trial court did not abuse its discretion under section 352 in admitting the evidence given the number of other factors favoring admission.

(People v. Bristow, slip op. at 20-21.)

The question whether evidence of prior uncharged acts was properly admitted under California law is not cognizable in this federal habeas corpus proceeding.  Estelle v. McGuire, 502 U.S. at 67.  The only question before this court is whether the trial court committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated federal due process.  Id.  See also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("the issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point").  A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'"  Mancuso, 292 F. 3d at 956 (quoting

1  Barefoot v. Estelle, 463 U.S. 880, 899 (1983).  Evidence violates due process only if "there are

2  no permissible inferences the jury may draw from the evidence."  Jammal, 926 F. 2d at 920.

3  Even then, evidence must "be of such quality as necessarily prevents a fair trial."  Id. (quoting

4  Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).  For purposes of AEDPA, petitioner

5  must demonstrate that the California courts' rejection of his federal due process claim was

6  contrary to or an unreasonable application of "clearly established Federal law, as determined by

7  the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1);  Lockyer v. Andrade, 538 U.S.

8  63, 70-71 (2003).

9              Petitioner's trial was not rendered fundamentally unfair because of the admission

10  of evidence of petitioner's prior uncharged offenses against Sarah and Brandy.  The trial court

11  took care in considering this evidence.  The trial court held a lengthy in limine hearing on the

12  motion to admit the uncharged offense evidence.  (RT 99-153; 175-80.)  The trial court issued its

13  tentative ruling allowing the admission of the uncharged offense evidence on January 8, 1997.

14  (RT 177.)  On January 16, 1997, the trial court issued its detailed ruling that granted admission of

15  the uncharged offense evidence.  (RT 363-448.)

16              As noted by the state trial court, the other incidents testified to by Sarah and

17  Brandy were no more inflammatory than the circumstances of the charged crimes – in fact, they

18  were decidedly less inflammatory.  The trial judge cited Lyndsay's fear that petitioner was going

19  to kill her.  (RT 376.)  The prolonged sexual assault of the bound teenaged victim was more

20  inflammatory than the prior molestations reported by Brandy and Sarah.  In addition, the prior

21  uncharged offense evidence was not unreliable.  The trial court took judicial notice of the

22  juvenile court's findings in a prior case, in which both Brandy and Sarah had testified under oath,

23  and noted that whether the juvenile court found by a preponderance of the evidence or by clear

24  and convincing evidence, the juvenile court found the molestation allegations to be true.  (RT

25  445.)  The prior uncharged offense evidence also concerned events that were not too remote in

26  time to the charged acts.

1    Moreover, evidence of these uncharged acts was also admissible to show

2    petitioner's intent and propensity to have sex with female children, and to negate the defense of

3    perceived consent.  These are rational inferences the jury could draw from the challenged

4    evidence that are not constitutionally impermissible.

5    Finally, the uncharged offense evidence was probative of the victims' credibility.

6    Both victims were "basically living on the streets" (RT 145) at the time of the crimes.  Lyndsay

7    was impeached with two prior convictions.  The trial judge allowed the defense to elicit the fact

8    that both Lyndsay and Crina had previously been involved in ganking.[2]  Lyndsay and Crina had

9    lived a lifestyle a jury might not approve (RT 145-46), which could have affected the jury's

10   assessment of the victims' credibility.

11   The United States Supreme Court "has never expressly held that it violates due

12   process to admit other crimes evidence for the purpose of showing conduct in conformity

13   therewith, or that it violates due process to admit other crimes evidence for other purposes

14   without an instruction limiting the jury's consideration of the evidence to such purposes."

15   Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), overruled on other grounds by

16   Woodford v. Garceau, 538 U.S. 202 (2003).  In fact, the Supreme Court has expressly left open

17   this question.  See Estelle v. McGuire, 502 U.S. at 75 n.5 ("Because we need not reach the issue,

18   we express no opinion on whether a state law would violate the Due Process Clause if it

19   permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

20   Thus, petitioner's claim that California Evidence Code § 1108 violates due process by allowing

21   admission of evidence of prior sexual crimes solely for the purpose of proving disposition to

22   /////

23   /////

24

25   [2] The trial judge admitted this evidence because it was not prohibited under California
     Evidence Code § 782 (prior sexual conduct of complaining witness) since it involved *not*
26   performing agreed-upon sexual acts.  (RT 192.)

1  commit the present offense is unavailing.  Accordingly, the state court's decision with respect to

2  this claim was not contrary to United States Supreme Court precedent.[3]

3          Further, any error in admitting this testimony did not have "a substantial and

4  injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  See also

5  Penry v. Johnson, 532 U.S. 782, 793-96 (2001).  There was direct evidence separate from the

6  propensity evidence that petitioner committed the crimes charged in the instant action.  Both

7  Crina and Lyndsay testified as to the events of that night.

8          In addition, Rafael Trujillo, Crina's neighbor, testified concerning Crina's

9  appearance at his door.  (RT 685.)  He testified that Crina's hands were tied behind her back and

10  that her mouth was taped shut by tape wound all the way around her head.  (RT 686-87.)  Trujillo

11  testified that Crina looked frightened, nervous and desperate.  (RT 689.)  Once released from her

12  bonds, Crina testified she went to the Star Market and called police.  (RT 1080-81.)  When police

13  arrived, Crina reported what happened and told the police she had written down petitioner's truck

14  license number in the laundry room.  (RT 480, 484.)  Officer Nies obtained the number from the

15  laundry room, called it into police dispatch, and then went to the address once dispatch relayed

16  the address from its records search.  (RT 481-82.)

17  /////

18

19          [3] California Evidence Code § 352 provided an adequate safeguard because under the
    AEDPA, state court findings of fact are presumed correct unless petitioner rebuts the
20  presumption with clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  Here, the state
    trial court noted that, although the uncharged offense evidence was prejudicial, it was probative
21  and relative because of its similarities to the instant action:  (1) force (even though of different
    degree); (2) threat to injury victim in the future; (3) manual manipulation of penis; (4) manual
22  contact with vaginal area; (5) oral copulation was major sex act in all offenses; (6) sex for pay
    (alleged ganking vs. alleged request of Brandy to disrobe for $100 bill); (7) all offenses involved
23  children (Lyndsay was 16 at time of alleged offense; Brandy was 10 and Sarah was 7 at time of
    uncharged offenses); (8) all offenses involved females; and (9) trial judge found similarities in
24  appearance of Lyndsay and Sarah (hair color, etc.).  (RT 372-73.)  The trial court found that the
    evidence came from an independent source, which enhanced its probative value.  (RT 374.)  The
25  trial court also found that the uncharged offense evidence was not unduly inflammatory and was
    not too remote in time.  (RT 375-76.)  The trial court's decision that the probative value of the
26  evidence outweighed its prejudicial effect was not "an objectively unreasonable determination of
    the facts."  28 U.S.C. § 2254(d)(2).

Lyndsay was found bound and gagged and buried under a tent held down by old tires. (RT 513.)  Officer Cunningham testified that tape was tightly bound around Lyndsay's throat. (RT 521.)  There were wraps of black electrical tape around her eyes. (RT 520.)  Officer Cunningham stated there was a "cloth gag in her mouth that was taped to her face with black electrical tape." (RT 519.)  Officer Cunningham testified that he felt it was a danger to Lyndsay's welfare to be taped up that tight, especially in the position she was in (hogtied,[4] laying face down on the ground). (RT 521, 514, 534.)  Officer Manetti testified that the wires tying her wrists and ankles were so tight he was afraid to use a knife to cut the wire because it might cut her skin, choosing instead to untie the knots. (RT 1242-43.)  Officer Manetti did use a knife to cut the wire that connected her wrists to her ankles. (RT 1243.)

These facts were sufficient to persuade a jury that Lyndsay was credible and that petitioner's defense that she was a prostitute who had consented to the sex acts was unavailing.

Moreover, any threat of improper prejudice flowing from the testimony was mitigated by the trial court's instruction directing the jury to consider the uncharged acts testimony only as it was relevant to show petitioner "has a general character trait to predispose him to commit the types of crimes alleged in this case, . . . the existence of a necessary specific intent element, or . . . [that petitioner] did not reasonably and in good faith believe that the person with whom he engaged or attempted to engage in a sexual act consented to such conduct." (CT 325; RT 1813-14.)  The jury was specifically instructed that they were not to find petitioner guilty of any or all charges in this case just because they believed he had committed a prior sexual offense or offenses or that he had a character trait that predisposed him to the commission of such offenses. (RT 1814-15.)  The jury was also told that the prior conduct was not sufficient by itself to prove guilt, and that its weight and significance, if any, were matters for the jury's determination. (RT 1815.)  The jury is presumed to have followed these instructions. <u>Old Chief</u>

---

[4] Officer Cunningham explained to the jury that hogtied meant that the hands were tied behind one's back and then the feet were brought up and tied to the hands. (RT 524.)

1  v. United States, 519 U.S. 172, 196-97 (1997); United States v. Reed, 147 F.3d 1178, 1180 (9th
2  Cir. 1998).

3  　　　　To the extent that petitioner maintains that the admission of this uncharged
4  offense evidence violated the Ex Post Facto Clause, his claim also fails.  The U.S. Constitution
5  provides that "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing
6  the Obligation of Contracts. . . ." U.S. Const., Art. I, § 10.  In Calder v. Bull, 3 U.S. (3 Dall.) 386,
7  390 (1798), Justice Chase gave the classic description of ex post facto laws:

8  　　　　　　　I will state what laws I consider *ex post facto* laws, within the
   　　　　　　words and intent of the prohibition.  1st.  Every law that makes
9  　　　　　　an action done before the passing of the law, and which was
   　　　　　　innocent when done, criminal; and punishes such action.  2d.
10 　　　　　　Every law that aggravates a crime, or makes it greater than it
   　　　　　　was, when committed.  3rd.  Every law that changes the
11 　　　　　　punishment, and inflects a greater punishment, than the law
   　　　　　　annexed to the crime, when committed.  4th.  Every law that
12 　　　　　　alters the legal rules of evidence, and receives less, or different
   　　　　　　testimony, than the law required at the time of the commission of
13 　　　　　　the offence, in order to convict the offender.

14 3 Dall. at 390.  The fourth Calder category is at issue here.  Despite some earlier case law
15 suggesting otherwise, the fourth category is still valid.  Carmell v. Texas, 529 U.S. 513, 537-39
16 (2000).

17 　　　　The fourth Calder category prohibits both laws that lower the burden of proof and
18 laws that reduce the quantum of evidence necessary to meet that burden.  Cf. Carmell, 529 U.S.
19 at 541.  However, that does not mean that a state may not change any evidence laws.  For
20 example, a change in a witness competency rule did not violate the Ex Post Facto Clause; the
21 changed rule did not always run in favor of the state and did not necessarily affect, let alone
22 subvert, the presumption of innocence.  See Carmell, 529 U.S. at 533 n.23, 546.  "The issue of
23 the admissibility of evidence is simply different from the question whether the properly admitted
24 evidence is sufficient to convict the defendant.  Evidence admissibility rules do not go to the
25 general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained." Id. at
26 546; see also Hopt v. Territory of Utah, 110 U.S. 574, 589-90 (1883).

Even assuming § 1108 was enacted after the uncharged offenses occurred, it did not lower the burden of proof for the prosecution and did not change the quantum of evidence necessary to convict, particularly in light of the jury instruction set forth above. The statute permitted the jury to consider additional relevant evidence that was not excluded under § 352 in determining whether the prosecution had met its burden of proof. Petitioner has not shown that § 1108 on its face or as applied in his case altered the burden of proof of the amount of evidence necessary to convict. Section 1108 changed evidence admissibility rules, but that was permissible under Carmell and did not run afoul of the Ex Post Facto Clause.

Accordingly, for all of these reasons, petitioner is not entitled to relief on his first claim.

### B. Failure to Grant New Trial Based on Juror Misconduct

Petitioner alleges the trial court abused its discretion by failing to grant petitioner a new trial due to juror misconduct in violation of his due process rights.

The state appellate court fairly described the facts surrounding this claim as follows:

> [Petitioner] moved for a new trial based upon a letter the trial court received from Juror No. 8, one month following the verdict. In her letter, Juror No. 8 alleged the following:
>
>> She did not believe [petitioner] was guilty, but she was coerced, threatened, and intimidated by the other jurors into voting for guilt. They caused her to cry on two different days. The foreperson, Juror No. 11, advised her that she should talk to the judge and ask to be replaced if she did not agree with the rest of the jurors. Every day she was questioned repeatedly regarding how she could conclude [petitioner] was not guilty. Before entering the court to deliver the verdict, the other jurors told her she better not change her mind or the judge would get mad and make them deliberate some more. She had hoped that, when the judge polled the jury, he would notice how upset she was and question her again whether it was her true verdict. After the verdict, one of the male jurors put his arm around her and walked her to her car so she could not talk

to anyone.  Some of the other jurors did not take the matter seriously and were biased because they had teenage daughters.

In an affidavit submitted with the motion for new trial, Juror No. 8 reiterated the majority of her claims, alleging she was yelled at, harassed, and felt physically threatened.  She added that, on the third or fourth day of deliberations, a male juror escorted her to lunch and discussed the case with her, trying to get her to agree with the other jurors.  He did not convince her to change her vote.

[Petitioner] moved for a new trial on the grounds that the jury had committed misconduct by harassing and intimidating Juror No. 8, and there had been improper private discussion about the case outside of deliberations.

In opposing the motion, the prosecutor submitted affidavits from two jurors, who denied that any coercion, intimidation, yelling or insults had occurred.  Rather, they declared:  Juror No. 8 continually resisted the evidence, could not put aside her personal feelings, and initially refrained from discussing the evidence until she was persuaded to participate.  The jurors carefully explained each piece of evidence to Juror No. 8 and handled her with "kid gloves."  Juror No. 8 got into a verbal altercation with one of the male jurors early in the deliberations, when she accused him of being closed minded and too quick to convict.

The trial court ruled Juror No. 8's letter was inadmissible because it was not written under oath, but could be considered for impeachment purposes to the extent it was inconsistent with her affidavit.  The court also ruled that various statements by the jurors were inadmissible to the extent they reflected their thought processes.

From the admissible evidence, the trial court concluded:  Juror No. 8 presented no evidence of objective conduct which demonstrated that she had been threatened or harassed; she simply had been pressed into giving and supporting her opinion, which is typical of normal deliberations and is not misconduct.  Juror No. 8 had numerous opportunities to talk to the court if there were problems during deliberations, but she did not do so.

As for the lunchtime conversation, the trial court found the allegation was not credible.  The court pointed out:  Juror No. 8 did not mention the conversation in her letter, even though she must have known the incident was an obvious violation of the admonition given by the court.  Her affidavit about the incident was devoid of facts such as the identity of the juror and the details of the conversation.  Moreover, she did not raise any alleged misconduct until after she had conversed with [petitioner's] family and visited [petitioner] in jail.  From these facts, the court inferred

the event did not occur.  In any event, the court concluded that, even assuming the lunchtime conversation did occur, it was not prejudicial because Juror No. 8 admitted she did not change her vote because of the conversation.

(People v. Bristow, slip op. at 13-15.)

The state appellate court rejected petitioner's jury misconduct claim, finding that the trial court's factual finding that the alleged lunchtime discussion did not occur was supported by the sound reasons articulated by the trial court.  (Id. at 16.)  The appellate court further found that the trial court reasonably concluded petitioner failed to establish objective evidence of harassment and intimidation because petitioner only presented Juror No. 8's conclusory assertions about being intimidated, without any supporting conduct by other jurors.  (Id.)  The appellate court noted that Juror No. 8 "did not describe any exceptionally harsh outbursts or threatening physical conduct."  (Id.)

The appellate court found that the fact that Juror No. 8 felt intimidated and consequently voted for guilt only demonstrated her mental processes and subjective considerations which influenced the verdict, which were inadmissible.  (Id.)  "To permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression."  (Id., at 16-17, citations omitted.)  The appellate court concluded that the absence of details in Juror No. 8's affidavit, her failure to apprise the court during deliberations of any inappropriate behavior, and her failure to speak up when individually polled, justified the trial court's conclusion that no juror misconduct occurred.  (Id. at 17.)

The appellate court further found that the trial court did not err by failing to have an evidentiary hearing to obtain more details from Juror No. 8.  (Id. at 17.)  The appellate court concluded that "[b]ecause Juror No. 8's affidavit did not present sufficient, admissible, credible evidence demonstrating a strong possibility that prejudicial jury misconduct occurred, the trial

/////

18

court did not abuse its discretion in resolving disputed factual questions without conducting a full

evidentiary hearing."  (Id. at 18.)

Affidavits and statements by jurors may not ordinarily be used to impeach a

verdict once the jury has been discharged unless extraneous influence has invaded the jury room.

McDonald and United States Fidelity and Guaranty Company v. Pless, 238 U.S. 264, 267-69

(1915); Mattox v. United States, 146 U.S. 140, 148-49 (1892).  In consonance with this principle,

Rule 606(b) of the Federal Rules of Evidence[5] prohibits the use of a juror's affidavit to impeach a

verdict except with respect to extraneous prejudicial information or outside influence:

> Upon an inquiry into the validity of a verdict or indictment, a juror
> may not testify as to any matter or statement occurring during the
> course of the jury's deliberations or to the effect of anything upon
> that or any other juror's mind or emotions as influencing the juror
> to assent to or dissent from the verdict or indictment or concerning
> the juror's mental processes in connection therewith, except that a
> juror may testify on the question whether extraneous prejudicial
> information was improperly brought to the jury's attention or
> whether any outside influence was improperly brought to bear
> upon any juror.  Nor may a juror's affidavit or evidence of any
> statement by the juror concerning matter about which the juror
> would be precluded from testifying be received for these purposes.

Id.

The declaration of Juror No. 8 addresses matters which occurred during the course

of deliberations and do not involve the jury's consideration of extrinsic material.  In particular,

her representations regarding the pressure placed on her by other jurors to vote guilty concern

only the deliberations.  Accordingly, the court may not consider this affidavit in evaluating the

jury misconduct claim.  See United States v. Casamayor, 837 F.2d 1509, 1515 (11th Cir. 1988)

("the alleged harassment or intimidation of one juror by another would not be competent

evidence to impeach the verdict under Rule 606(b)"); United States v. Barber, 668 F.2d 778, 786-

---

[5]  The Federal Rules of Evidence apply to habeas corpus proceedings to the extent that the
habeas statutes themselves provide no different rule of evidence.  Fed. Rules of Evidence, Rule
1101(e).  There is no habeas evidentiary rule on the subject.  Thus, the court looks to Rule 606(b)
of the Federal Rules of Evidence.

1  87 (4th Cir. 1982) (evidence that a juror had been threatened by the jury foreman held

2  inadmissible to impeach verdict under Rule 606(b)).  See generally United States v. Rutherford,

3  371 F.3d 634, 639 (9th Cir. 2004) (juror discussion of defendant's failure to testify in violation of

4  court's instructions is inadmissible).

5          Petitioner cites Remmer v. United States, 347 U.S. 227, 229-30 (1954) for the

6  proposition that the remedy for alleged juror bias or misconduct is a hearing in which the trial

7  court determines the circumstances of the alleged misconduct, the impact on the jurors, and

8  whether it was prejudicial.  However, Remmer involved an alleged incident of juror tampering by

9  a third party, someone not a member of the jury.  Jury tampering generally refers to private

10 communications between third persons and jurors.  The Supreme Court has held that private

11 communication, contact, or direct or indirect tampering with a juror during a trial about the

12 matter pending before it, "if not made in pursuance of known rules of the court and the

13 instructions and directions of the court made during the trial, with full knowledge of the parties"

14 may result in a due process violation.  Remmer, at 229.  Juror misconduct, on the other hand,

15 includes activity by members of the jury which is inconsistent with the instructions by the court.

16         The underlying issue in these cases is a defendant's right to a fair and impartial

17 jury.  Jury tampering and juror bias present the clearest examples of potentially improper

18 influences upon a jury, while the notion of juror misconduct creates a more difficult extension of

19 the issue.  See United States v. Dutkel, 192 F.3d 893, 894-96 (9th Cir. 1999)("Jury tampering is a

20 much more serious intrusion into the jury's processes [than juror misconduct] and poses an

21 inherently greater risk to the integrity of the verdict.")  The decision to conduct a hearing into

22 alleged jury misconduct and to determine its extent and nature is discretionary.  United States v.

23 Berry, 627 F.3d 193, 197 (9th Cir. 1980); United States v. Hendrix, 549 F.2d 1225, 1227-28 (9th

24 Cir.), cert. denied, 434 U.S. 818 (1977).  Not every allegation of jury misconduct requires a

25 hearing.  United States v. Halbert, 712 F.2d 388 (9th Cir. 1983)( no hearing required where trial

26 court knew the scope and nature of extraneous information received by a juror); accord, United

20

States v. Madrid, 842 F.2d 1090, 1094 (9th Cir. 1988)(upon learning of possible juror misconduct, the trial court must hold a hearing only after finding a reasonable possibility of prejudice).  Thus, the trial court did not err by failing to hold an evidentiary hearing on this claim.

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   May 26, 2005.

UNITED STATES MAGISTRATE JUDGE

1; bris2546.157

21